UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x

PATRICK BARNICLE, on Behalf of Himself   :
and Others Similarly Situated,

                              Plaintiff,

      vs.

MELLANOX TECHNOLOGIES, LTD, EYAL
WALDMAN, MICHAEL GRAY and JACOB
SHULMAN,

                         Defendants.

———————————————— x

Civil Action No. _____

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff, Patrick Barnicle, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Mellanox Technologies, Ltd. ("Mellanox" or the "Company"), as well as media reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Mellanox between April 19, 2012 and January 2, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants include Mellanox, its co-founder, Chairman of the Board and Chief Executive Officer ("CEO"), Eyal Waldman ("Waldman"), its former Chief Executive Officer ("CFO"), Michael Gray ("Gray), and its former Vice President of Finance and current CFO, Jacob Shulman ("Shulman").

2.      Defendant Mellanox was organized under the laws of Israel in 1999 and is headquartered in Yokneam, Israel. Its common shares have been registered and trading on the NASDAQ since 2007. As a fabless semiconductor company, Mellanox produces and supplies interconnect products for computing, storage, and communication applications in the computing, Web 2.0, storage, financial services, database, and Cloud markets. It offers semiconductor interconnect products that facilitate data transmission between servers, storage systems,

communications infrastructure equipment, and other embedded systems. Though it also offers Ethernet interconnect products, the Company's most lucrative product offering at the start of the Class Period was its InfiniBand product offerings. InfiniBand technology is used to transfer and store data in high-end computing and data centers.

3.      The Company sells its products through a direct sales force, a network of domestic and international sales representatives, and independent distributors in the United States, China, Israel, Europe, and other parts of North America and Asia. As the Company's 2011 Annual Report to Shareholders on Form 10-K disclosed, however, a very "small number of customers account for a significant portion of [the Company's] revenues." In fact, the Company had less than 269 customers in fiscal 2011. Sales to Hewlett-Packard Company ("HP") accounted for a full 19% of Mellanox's 2011 total revenues and sales to IBM accounted for another 17% of total revenues. And by the end of the Company's 1Q 2012 (ended March 31, 2012), Mellanox's customer concentration had grown substantially, with 42% of its revenues coming from just those two customers (HP at ~18% and IBM at ~24%). As such, any perceived weakness in demand from any of the Company's few customers would be viewed as very material to investors because of the potential adverse impact on the Company's growth performance.

4.      Mellanox has also relied heavily upon a long-running partnership with its much larger networking competitor Intel Corporation ("Intel"), one in which Intel has been both a significant development partner with and customer of Mellanox. Indeed, the Company's stock price would soar 10% in intraday trading to an all-time high of $68.26 on June 8, 2012, when Mellanox announced it had won a new contract to supply Intel with Mellanox's ConnectX-3 FDR InfiniBand adapter silicon. Intel's launch of its Romley CPU platform in the 1Q 2012, requiring a faster connection

between servers, significantly increased demand for Mellanox's InfiniBand interconnect products in the period preceding the start of the Class Period.

5.     However, Defendants knew – based on their work in co-developing the InfiniBand chip for use in Intel's Romley CPU – *but concealed from the market*, that the sales bump induced by the Intel Romley CPU rollout in the 1Q 2012 would be short-lived.  Mellanox's premium InfiniBand chips are used in high-performance computer ("HPC") clusters.  InfiniBand is a hardware interconnection tool that allows stacks of databases, servers, and computers to "talk" to one another. While most commercial servers are perfectly content with 1G/sec or 10G/sec Ethernet interconnection, a small niche of specialized HPC clusters prefer the higher speed and low latency of InfiniBand, of which Mellanox was the leading supplier at the start of the Class Period, and are willing to pay the higher prices associated with it.  In particular, Intel's Romley CPU core, which was released in 1Q 2012, included Mellanox's InfiniBand product offerings as among its preferred interconnection tools.  Therefore, each time that an HPC cluster upgraded to the Intel Romley core, many would purchase the Mellanox InfiniBand interconnectors as well.  Defendants knew, however, that these Romley upgrade sales of its very expensive niche product would be short-lived, due both to their being related to product upgrades and to those customers representing only the highest-end of the supercomputing market.  Thus, contrary to Mellanox's bullish Class Period statements presenting the resulting sales increases in Mellanox's own 1Q and 2Q 2012 quarters as a straight-line quarter-over-quarter growth attributable to their own business acumen, a broadening of market demand for InfiniBand interconnectivity products, and strong customer adoption of the Mellanox solution in particular, Mellanox knew the Romley upgrade-induced sales bump would quickly dissipate in late 2012.

6.      As the upgrade cycle for Intel's Romley CPU played out, Mellanox knew that its own InfiniBand revenue growth would plateau in late 2012 and sharply reverse in 2013.  Indeed, as Mellanox's lead product (31% of Q1 2012 and 54% of Q2 2012 revenues), the Romley InfiniBand CPU upgrade product had been tailored specifically for the Romley CPU system, meaning that its sales would run in tandem with Intel's Romley CPU shipments.  Without the Romley upgrade shipments, there was actually ***no growth*** in sales of Mellanox's core product in the 1Q and 2Q 2012.

7.      Equally detrimental, Intel had acquired Q-Logic Corporation's InfiniBand business on February 29, 2012 for $125 million.  And Mellanox knew, but concealed from the market throughout the Class Period, that Intel was rapidly developing its own InfiniBand product offering that would not only compete with, but actually leapfrog Mellanox's 56Gb/sec InfiniBand product offering by offering a far-superior 120/sec solution.

8.      Despite these clearly material risks to the Company's business model, Mellanox repeatedly increased its own forward financial guidance throughout the Class Period – ignoring both the potential decreases in Intel's own demand for Mellanox InfiniBand-related product offerings and competition from the networking behemoth with far superior sales and technological capabilities.  Mellanox also concealed that repeated reports of significant product glitches with its own InfiniBand product offerings during the Class Period were diminishing sales demand and increasing the Company's manufacturing costs.

9.      The Class Period commences on April 19, 2012.  On that day, the Company's stock price increased $22.58 per share, ***more than 52%***, on extremely high trading volume of more than 5.2 million shares trading and closed at its then-all-time high of $65.91 per share following Mellanox's announcement, after the close of trading on April 18, 2012, that the Company had achieved all-time high sales revenues of $88.7 million in the 1Q 2012 and that the Company's

2Q 2012 sales were on track to increase significantly to between a range of between $125 and $130 million. The outsized 1Q 2012 revenues, which reflected a 22% increase over the Company's 4Q 2011 revenues, significantly beat the Company's prior guidance of a range of $81 to $82 million for the 1Q 2012. Defendants emphasized that it included only $10 million of one-time Romley upgrade induced revenues, and the 2Q 2012 guidance also contained a mere $30 million "one-time opportunity related to the Intel Romley release." Either way, Mellanox's increased 2Q 2012 guidance also far exceeded the median analyst estimate of $83.4 million for the 2Q 2012. Defendants stated the Company's stellar 1Q 2012 results were due to an InfiniBand 56Gb/sec product sales ramp to 31% of 1Q 2012 revenues, up more than 100% from the product's 14% sales contribution in 4Q 2011.

    10.    Then, following the 10% stock price spike on June 8, 2012 (precipitated by the Intel supply contract announcement), the Company's stock price again spiraled to a new all-time high on July 19, 2012 when Mellanox reported, after the close of trading on July 18, 2012, its 2Q 2012 financial results and increased 3Q 2012 sales growth forecast, which again far surpassed analyst estimates. The Company's 2Q 2012 sales of $133.5 million came in at the high end of the Company's previous guidance range and more than doubled its revenues in the 2Q 2011. Revenue growth of ~50% sequentially was again mainly due to InfiniBand growth, and Intel Romley server and storage platforms again drove that strong growth. Despite knowing that demand was decreasing and the outsized 1Q and 2Q sales growth was not going to repeat in the second half of 2012, Defendants again increased the Company's 3Q 2012 sales forecast to a range of $150 million to $155 million, far exceeding the median estimate of analysts of $104 million. Instead, during a conference call held with the investment community that evening, Defendant Waldman emphasized that the 2Q 2012 results demonstrated that the Company's industry-leading InfiniBand technology

- 5 -

was becoming the interconnect of choice for Cloud and Web 2.0 data centers, emphatically stating: "*[w]e continue to see InfiniBand take market share in various markets as the leading interconnect for server and storage platforms*," and: "*[w]e are seeing InfiniBand become more dominant as a storage interconnect across various markets and applications*." Defendant Gray added: "*I think it's safe to say we're seeing continued momentum in terms of adoption . . . it's really healthy growth that we're expecting. . . .*"[1]

11.     The investment community was again elated. This time Mellanox's stock price soared *more than 51%*, closing up $27.52 per share on July 19th from its July 18th close of $66.38, again on extremely high trading volume of more than 6.3 million shares. ThinkEquity LLC raised its price estimate for Mellanox to $120 from $81, while Wunderlich Securities Inc. increased its price estimate to $150 from $85. Based on Defendants' bullish statements concerning the purported strong demand then being experienced for Mellanox's InfiniBand product offerings, Mizuho analyst Ruben Roy summarized the source of the market's exuberance, telling *Bloomberg* that Mellanox was "a company finding itself in a very unique position *where the demand for [t]heir technology is increasing at a rapid pace and they have no competition*." Likewise, Wunderlich Securities Inc.'s Brian Freed told *Bloomberg* that his firm was "in general stunned at the pace of growth and the *sustained demand for their technology*," reiterating that, "*[t]here is a great demand for their InfiniBand and we see the pace of growth continuing at a high clip*."

12.     Defendants' Class Period materially false and misleading statements regarding the purportedly strong and consistent demand for the Company's product offerings concealed what Mellanox knew of the advanced development pace of Intel's own InfiniBand product offerings and

---

[1]     All emphasis is added unless otherwise noted.

the negative impact that would have on both Mellanox's sales growth and Intel's demand for Mellanox product offerings. Defendants also concealed that they were receiving a deluge of customer complaints about Mellanox's own InfiniBand product offerings during the Class Period, and the adverse impact that was having on sales demand and costs. As a result, Mellanox's stock traded at artificially inflated prices during the Class Period, trading above $120 per share in intraday trading by September 6, 2012, and allowing several insiders to cash out by selling millions of dollars of Mellanox stock at fraud-inflated prices. Defendants were also able to obtain the requisite shareholder approval of a new $5.25 million executive perk package for Defendant Waldman at Mellanox's May 14, 2012 Annual General Meeting of Shareholders ("AGM"). And, hoping to partake in a sale of Mellanox at a price reflecting the same steep premium Intel paid for Q-Logic in February 2012, Defendants touted Mellanox's purportedly stellar financial results and expectations during the Class Period in order to elicit interest from potential acquirers, including participating in multiple investor conferences and roadshows.

13.    However, through a series of partial disclosures made between September 7, 2012 and January 3, 2013, the market learned that the Company's business was not as Mellanox had portrayed it throughout the Class Period, causing significant declines in the price of Mellanox stock.

14.    First, on Friday September 7, 2012, Stifle Nicolaus' Kevin Cassidy downgraded Mellanox shares from "Buy" to "Hold," based on his independent research demonstrating that the market price of the Company's stock fully reflected the Company's revenue growth and potential for further gains. Mellanox's stock price fell 7.6% on this news, from $119.93 to $110.85, on unusually high trading volume of more than 2.9 million shares.

15.    Then, on the following Monday, September 10, 2012, Mellanox suddenly announced that Defendant Gray, who had been its CFO since 2004 and throughout is history as a

publicly-traded company, was resigning. This news, right on the heels of the Stifel Nicolaus downgrade, shocked the market even more. The Company's shares were again hammered, falling 8%, from their September 7, 2012 close of $110.85 to close at $101.65 on September 10, 2012, on even more unusually high trading volume of more than 6.2 million shares trading.

16.     That same day, *Reuters* reported that Defendant Waldman had confirmed during an interview at the High-Tech Industry Association conference that Mellanox had indeed received multiple inquires concerning proposed acquisitions over the past year.

17.     Stock analyst Kerrisdale Capital also published a report on *Seeking Alpha* on September 10, 2012 concluding that sales of Mellanox's InfiniBand adapters would slow in late 2012 and sharply decline in 2013 as the boost in sales growth attributable to the Intel Romley CPU upgrade wound down, and that the Company faced growing competition. Seeking to prevent a free-fall in the Company's stock price, Mellanox responded to the Kerrisdale Capital report saying that its InfiniBand product would not face serious competition from rivals for at least three years. And by September 15, 2012, the price of Mellanox stock had rebounded 0.7%, closing at $102.41 on September 11, 2012.

18.     But the price of Mellanox stock would again plummet on October 18, 2012 when Mellanox reported 3Q 2012 financial results and issued lower than expected 4Q 2012 fiscal 2012 financial guidance. Though the Company reported $156.5 million in 3Q 2012 revenues, Mellanox now stated its 4Q 2012 revenue would come in between $145 and $150 million, pushing its fiscal 2012 revenue guidance down to between $524 and $529 million. Based on Defendants' prior guidance and bullish statements, analysts had, on average, expected revenues of $156.8 million for the 4Q 2012 and $532 million in sales during fiscal 2012. Despite Defendants' efforts on October 18, 2012 to allay investors' worse fears by adamantly maintaining that the Company continued to

experience strong demand for its InfiniBand product offerings, the price of Mellanox stock was further hammered, falling ***nearly 30%*** as this news trickled into the market, falling from its close of $104.92 on October 16, 2012 to close at $77.99 on October 18, 2012, on extremely high trading volume more than 3.2 million shares trading on October 17th and more than 6.9 million shares trading on October 18th.  Defendant Waldman told *Globes* on October 18, 2012 that the markets were "overreacting," stating Defendants remained "satisfied" with Mellanox's growth.  Defendant Waldman also told *Globes* that the 3Q 2012 results "demonstrate[d] the company's continued ability to increase its penetration into existing markets, as well as to expand into new markets for our InfiniBand solutions."   During the conference call with investors, Defendant Waldman finally conceded that the Company's outsized 1Q and 2Q 2012 sales had been due to "large deals . . . due to the Romley pent-up demand," but now claimed that the Company's estimated $150 million in sales in the 4Q 2012 were not at all reliant upon "significant large deals," emphatically stating that the Company's Romley business would continue to grow in fiscal 2013, as people continued building large supercomputers based on Romley and future generations from Intel.

19.    The market believed Defendants' continued bullish claims that the reduced outlook did not reflect a slowdown in the adoption of its technology, and, as a result, the price of Mellanox stock remained artificially inflated.  For instance, Lazard Capital Markets' Daniel Amil maintained his "Buy" rating, stating that while the guidance was disappointing, the Company's prospects remained strong, reiterating Defendants' bullish demand mantra.  In its report, Lazard attributed the weak outlook to the "lumpiness of large deals," but stated it did not signal a permanent slowdown in the adoption of Mellanox's product offerings.  Likewise, Deutsche Bank only cut its target price by 22% to $110 and Barclays Capital reiterated its target price of $140.

20.     However, the price of Mellanox stock again fell precipitously on November 28, 2012 on market rumors that Intel was making substantial progress on developing its own InfiniBand adaptor and that Intel's product would leapfrog Mellanox's by offering 120/sec compared to Mellanox's 56Gb/sec. Despite denials by "unnamed" sources within Mellanox to *Globes* that there was nothing new to report and that the reports concerning Intel were not true, the price of Mellanox stock fell $16.42 per share – *or 20%* – between its November 27, 2012 close of $84.30 and its December 4, 2012 close of $67.88, again on unusually high trading volume.

21.     Finally, at 4:05 p.m. ET on January 2, 2013, Defendants were forced to concede that Mellanox had grossly missed its 4Q 2012 revenue guidance of a range of $145 to $150 million *by upwards of 20%*, reporting the Company would book sales of only $119 to $121 million in the 4Q 2012. The press release finally attributed this "shortfall," in pertinent part, to "*a weaker demand environment*" and to "*a technical issue associated with FDR 56Gb/s InfiniBand cabling which caused approximately $20 million of FDR deployments to be delayed*." In an interview with *Bloomberg* that evening, Defendant Waldman also conceded he knew that the Company was subject to "significant competition" from Intel in the market for its 56Gb/sec InfiniBand product beginning in 2014. Responding to analyst critiques that Mellanox was not forthcoming enough with the investment community during the Class Period in an interview Tel Aviv-based *Globes* reported on January 4, 2012, Defendant Waldman conceded that despite having seen "that sales were not up to expectations" during the Class Period, Mellanox "didn't rush to tell" the market. Defendant Waldman also told *Globes* that although he did not "feel good about the fact that [Mellanox had] not met [its] guidance," "*it's part of the game. . . .*" On this news, the price of Mellanox stock plummeted another *18%*, closing at $50.70 per share on January 3, 2013, down $10.49 from its

January 2nd close, on extremely high trading of approximately 8.3 million shares trading, or six times the average daily volume over the previous ten trading days.

22.    Thereafter, on January 23, 2013, after the close of trading, Mellanox announced its 4Q 2012 financial results.  In addition to the lower 4Q revenues disclosed on January 2nd, the Company disclosed that in addition to "a weaker demand environment" and "a technical issue which was resolved during the quarter," the Company's 4Q 2012 revenues were harmed by "a build-up of inventory at an OEM customer."  Mellanox also issued an alarming warning on Q1 2013 results, stating on its earnings conference call later that was only on track to achieve revenue of $78 million to $83 million during the 1Q, upwards of 48% below analyst the consensus averaging $131.8 million Mellanox had led the market to expect.  The Company attributed this 1Q 2013 revenue guidance shortfall to a Q4 2012 inventory build up.  These post-Class Period disclosures confirmed the demise in the Company's business model.  For instance, Brian Freed, an analyst at Wunderlich Securities, Inc. told *Reuters* in a reported telephone article that: "[i]t's very bad for a company to miss twice. It will, if not permanently then for a very long time, impair the multiple Wall Street is willing to pay for the stock."

23.    The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Mellanox was receiving a continuous stream of customer complaints concerning glitches in its InfiniBand product offerings during the Class Period;

(b)    Mellanox knew that the pace of Intel's development of its own competing InfiniBand adaptor would both diminish Intel's demand for Mellanox's product offering and detrimentally increase competition in the InfiniBand market that Mellanox enjoyed a near monopoly in;

- 11 -

(c)     Mellanox knew that its outsized 1Q and 2Q sales growth was not sustainable and was not the result of Defendants' business acumen, growth in the InfiniBand market generally, or significant adoption by the market of Mellanox's own InfiniBand product offerings, but was instead due to short-term sales boosts attributable to Intel's rollout of the Romley CPU upgrade;

(d)     Mellanox's inventory was dramatically increasing, both at the Company and in the hands of at least one significant OEM customer, which would decrease sales and profit margins going forward; and

(e)     as a result, Mellanox knew its actual sales growth supported neither its own 4Q 2012 guidance nor the inflated share price targets the investment community was modeling based on Defendants' bullish Class Period statements and guidance.

24.     As a result of defendants' false statements, Mellanox stock traded at inflated levels during the Class Period.   However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down approximately *58%* from their Class Period high and ***more than $2.93 billion*** in market capitalization simply vanished.  These price spikes and declines were Company specific and caused by Defendants' misstatements and subsequent revelations of the truth, as the S&P 500 remained relatively flat during this same period:



## JURISDICTION AND VENUE

25.     The claims asserted herein arise under §§10(b), 20(a) of the Exchange Act, 15 U.S.C.

§§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27

of the Exchange Act, 15 U.S.C. §78aa.

26.     Venue is proper in this district pursuant to §27 of the Exchange Act.  Acts and

transactions giving rise to the violations of law complained of occurred in this district.  The

NASDAQ National Exchange is located in this District and the Company also held and/or

participated in various investor and technology conferences in this District during the Class Period,

including:

- Various members of Mellanox management presented at the NDRS with Lazard held on June 6, 2012 in New York City;

- Defendant Gray presented at the Barclays Global Technology, Media and Telecommunications Conference held on May 23, 2012 in New York City;

- Defendant Waldman presented at the Jefferies 2012 Global TMT Conference held on May 7, 2012 in New York City;

- Defendant Waldman presented at the Twenty-Eighth Annual NASDAQ OMX Investor Program held on June 26, 2012 in New York City;

- Defendant Gray presented at ThinkEquity's 9th Annual Growth Conference held on September 12, 2012 in New York City;

- Defendants Waldman, Gray and Shulman conducted a non-deal roadshow in New York City on September 21, 2012 to, in part, introduce Shulman as Mellanox's new CFO;

- Defendants Waldman, Gray and Shulman presented at Mellanox's 2012 Analyst Day Conference held on October 19, 2012 in New York City;

- Defendant Shulman presented at the Credit Suisse Technology Conference held on November 14, 2012 in New York City;

- Defendant Shulman presented at the UBS Global Technology Conference held on November 14, 2012 in New York City;

- Various members of management presented at Mellanox's "full-day, hands-on" "Big Data Roadshow," held on September 19-24, 2012 in New York City; and

- Various members of Mellanox's management presented at JPMorgan's SMid Cap Conference held on November 29, 2012 in New York City.

**THE PARTIES**

27.    Plaintiff, Patrick Barnicle, purchased Mellanox common stock during the Class Period as set forth in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

28.    Defendant Mellanox is organized under the laws of Israel and headquartered in Yokneum, Israel. During the Class Period, Mellanox had more than 42 million shares of common stock outstanding, which shares traded in an efficient market on the NASDAQ under the ticker symbol "Mellanox." The Company's stock also trades on an Israeli stock exchange. Mellanox was followed by scores of stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor

- 14 -

and analyst conferences. Mellanox also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.

29.    Defendant Waldman co-founded Mellanox and served as its CEO and Chairman of its Board of Directors during the Class Period, having assumed those titles in 1999. Prior to that, from August 1989 to March 1993, Defendant Waldman held a number of design and architecture related positions at Intel.

30.    Defendant Gray served as Mellanox's CFO from 2004 until he resigned effective November 5, 2012.

31.    Defendant Shulman served as Mellanox's Vice President of Finance from March 2012 through and including November 5, 2012, when he became Mellanox's CFO. Previously, Shulman had joined the Company as its Controller in 2007.

32.    Defendants Waldman, Gray and Shulman are sometimes referred to herein collectively as the "Individual Defendants."

33.    During the Class Period, the Individual Defendants ran Mellanox as "hands-on" managers overseeing Mellanox's operations and finances and made the material false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of Mellanox's financial and business operations, as they received daily reports and had access to computerized information regarding sales, costs and expenses, product demand, inventory management and problems with the Company's high-priced product offerings because of the Company's small client base. They were also intimately involved in deciding which disclosures would be made by Mellanox. Indeed the Individual Defendants made various public statements for Mellanox during the Class Period, and participated in all Class Period investor conferences.

## BACKGROUND TO THE CLASS PERIOD

34.    Defendant Mellanox was organized under the laws of Israel in 1999 and is headquartered in Yokneam, Israel. Mellanox, a fabless semiconductor company, produces and supplies interconnect products for computing, storage, and communication applications in the computing, Web 2.0, storage, financial services, database, and Cloud markets. It offers semiconductor interconnect products that facilitate data transmission between servers, storage systems, communications infrastructure equipment, and other embedded systems. The Company offers some Ethernet connectivity products, but its most lucrative product offering at the start of the Class Period was its InfiniBand connectivity offerings. InfiniBand technology is used to transfer and store data in high-end computing and data centers.

35.    The Company sells its products through a direct sales force, a network of domestic and international sales representatives, and independent distributors in the United States, China, Israel, Europe, and other parts of North America and Asia. As the Company's 2011 10-K disclosed, however, a very "small number of customers account for a significant portion of [the Company's] revenues," and the Company had less than 269 customers during fiscal 2011. Significantly, according to the 2011 10-K, sales to HP accounted for a full 19% of Mellanox's 2011 total revenues and sales to IBM accounted for another 17% of total revenues. By the end of the Company's 1Q 2012 (ended March 31, 2012), Mellanox's customer concentration had grown substantially, with 42% of its revenues coming from just those two customers (HP at ~18% and IBM at ~24%). Any perceived weakness in demand from any of the Company's few customers would therefore be viewed as very material to investors because of the potential adverse impact on the Company's growth performance.

36.    Mellanox has also relied heavily upon a long-running partnership with its much larger networking competitor Intel, one in which Intel has been both a significant customer of and a

development partner with Mellanox. Intel's launch of its Romley CPU platform in the 1Q 2012, requiring a faster connection between servers, significantly increased demand for Mellanox's InfiniBand interconnect products in the period preceding the start of the Class Period.

37.     But Defendants knew – based on their work co-developing the InfiniBand chip for use in Intel's Romley CPU – *but concealed from the market*, that the Intel Romley-based sales growth boost would be short-lived. Mellanox's premium InfiniBand chips are used in HPC clusters. InfiniBand is a hardware interconnection tool that allows stacks of databases, servers, and computers to "talk" to one another. While most commercial servers are perfectly content with 1G/sec or 10G/sec Ethernet interconnection, a small niche of specialized HPC clusters prefer the higher speed and low latency of InfiniBand, of which Mellanox was the leading supplier at the start of the Class Period, and are willing to pay the higher prices associated with it. In particular, Intel's Romley CPU core, which was released in 1Q 2012, included Mellanox's InfiniBand product offerings among its preferred interconnection tools. Therefore, each time that an HPC cluster upgraded to the Intel Romley core, many would purchase the Mellanox InfiniBand interconnectors as well. Defendants knew, however, that these Romley upgrade sales of its very expensive niche product would be short-lived, due both to their being related to product upgrades and to those customers representing only the highest-end of the supercomputing market. Thus, contrary to Mellanox's bullish Class Period statements presenting the resulting sales increases in Mellanox's own 1Q and 2Q 2012 quarters as a straight-line quarter-over-quarter growth attributable to their own business acumen, a broadening of market demand for InfiniBand interconnectivity products, and strong customer adoption of the Mellanox solution in particular, Mellanox knew the Romley upgrade-induced sales bump would quickly dissipate in late 2012.

38.     As the upgrade cycle for Intel's Romley CPU played out, Mellanox knew that its own InfiniBand revenue growth would plateau in late 2012 and sharply reverse in 2013. Indeed, as Mellanox's lead product (31% of Q1 2012 and 54% of Q2 2012 revenues), the Romley InfiniBand CPU upgrade product had been tailored specifically for the Romley CPU system, meaning that its sales would run in tandem with Intel's Romley CPU shipments. Without the Romley upgrade shipments, there was actually *no growth* in sales of Mellanox's core product in the 1Q and 2Q 2012.

39.     Equally detrimental, Intel had acquired Q-Logic Corporation's InfiniBand business on February 29, 2012 for $125 million. And Mellanox knew, but concealed from the market throughout the Class Period, that Intel was rapidly developing its own InfiniBand product offering that would not only compete with but actually leapfrog Mellanox's 56Gb/sec InfiniBand product offering by offering a far-superior 120/sec solution.

40.     Despite these clearly material risks to the Company's business model, Mellanox repeatedly increased its own forward financial guidance throughout the Class Period – ignoring both the potential decreases in Intel's own demand for Mellanox InfiniBand-related product offerings and competition from the networking behemoth with far superior sales and technological capabilities. Mellanox also concealed that repeated reports of significant product glitches with its own InfiniBand product offerings during the Class Period were diminishing sales demand and increasing the Company's manufacturing costs.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

41.     The Class Period commences on April 19, 2012. After the close of trading on April 18, 2012, the Company issued its 1Q 2012 earnings report. The press release stated that Mellanox had achieved all-time high sales revenues of $88.7 million in the 1Q 2012. The outsized 1Q 2012 revenues, which reflected a 22% increase over the Company's 4Q 2011 revenues, significantly beat

the Company's prior guidance of a range of $81 to $82 million for the 1Q 2012. The press release also quoted Defendant Waldman describing the purported strong demand then being experienced for Mellanox's purportedly stellar product offerings, stating, in pertinent part, as follows:

> Our strong quarterly revenue growth reflects the ***increased penetration*** of our ***high-performance*** InfiniBand and Ethernet interconnect solutions in new markets, in addition to our traditional High Performance Computing (HPC) market, specifically, the Web 2.0, database, storage and cloud markets. The recent launch of Intel Romley and Sandy Bridge-based server and storage platforms ***has created a significant industry-upgrade and end-user demand for high-performance interconnects***. Our FDR 56Gb/s InfiniBand and 10/40GbE interconnect solutions provide these end-users with industry-best performance and return-on-investment.

42.    During the conference call that followed at 5:00 p.m. ET, Mellanox attributed its stellar 1Q 2012 results to an InfiniBand 56Gb/sec product sales ramp to 31% of 1Q 2012 revenues, up more than 100% from the product's 14% sales contribution in 4Q 2011, only $10 million of which were "one-time" Romley upgrade revenues. Defendant Waldman expressly emphasized during the call that "***[e]ven without those [] kind of one-time lump opportunities, [Mellanox was] experiencing a very healthy growth in [its] revenues***" and that "***as expected***," the Company's InfiniBand product offerings "***continue[d] to gain traction in the marketplace***." Defendant Waldman also emphatically rejected the notion during the call that Intel presented any competitive risk, stating that the Company was, "in terms of InfiniBand ahead of Intel, or previously QLogic" and that ***it would "take several years for Intel until they . . . come with something that is competitive***." Defendants also stated that the Company's 2Q 2012 sales were then on track to significantly increase to a range of between $125 and $130 million, only $30 million of which would be a "one-time opportunity related to the Intel Romley release." Mellanox's increased 2Q 2012 guidance far exceeded the median analyst estimate of $83.4 million for the 2Q 2012.

43.     On this news, the price of Mellanox stock increased *$22.58 per share, more than 52%*, on extremely high trading volume of more than 5.2 million shares trading and closed at its then-all-time high of $65.91 per share on April 19, 2012.

44.     On May 7, 2012, Defendant Waldman presented in New York City at the Jefferies Global Technology, Internet, Media & Telecom Conference, restating and reemphasizing the Company's 2Q financial forecast provided on April 18, 2012. During his presentation, Defendant Waldman also repeatedly and emphatically adopted the analyst community's financial expectations for the Company's future financial performance based on their financial models driven by Defendants' own bullish statements to the market, even intimating that the Company could beat those estimates: "I think the consensus this year for the analysts is about $430 million. And we say that we can go over $1 billion revenues, organic growth in the future." Defendant Waldman also emphasized: *"we think we can continue growing in the coming years in a pretty fast pace,"* *"[i]n terms of annual revenues, we're growing very fast,"* and *"we believe we continue growing pretty fast into 2013."* Defendant Waldman also explained that only $10 million of the Company's 1Q 2012 sales revenues, and only $30 million of its projected 2Q 2013 sales revenues were one-time Intel Romley upgrade-events, emphasizing that Defendants had not forecast those to "repeat" in the 3Q and as such, expressly emphasized that "analysts ha[d] gotten to the $430 million run rate" for fiscal 2012 without including any additional one-time Intel Romley upgrade-driven revenues. And again refuting any potential competitive threat from Intel, Defendant Waldman stated "[w]e believe its going to take them at least two, three years to get their silicon out, and then one or two more years to get their software on top of that."

45.     On May 15, 2012, Mellanox disclosed that its shareholders had approved Defendant Waldman's $5.25 million executive perk package at the Company's 2012 AGM on May 14, 2012.

46.    Thereafter, on May 23, 2012, Defendant Gray presented at the Barclays Capital Global Technology, Media and Telecommunications Conference, restating and reemphasizing the Company's 2Q financial forecast provided on April 18, 2012, and again emphasizing that only $30 million of the $125 to $130 million in sales being forecast was Intel Romley upgrade-induced. In fact, Defendant Gray expressly adopted the analyst community's financial models and projections based on Defendants' own bullish statements, stating: "I think most of the Street has been, in the second half of the year, taken the midpoint of this Q2 guidance in terms of revenue, adjusted out $30 million to get to $97.5, and they're using that as their baseline in terms of building on topline revenue for the Q3 and Q4. Health amounts of that cash from operation."

47.    The price of Mellanox stock price would again spike 10% in intraday trading to an all-time high of $68.26 on June 8, 2012, when Mellanox announced it had won a new contract to supply Intel with Mellanox's ConnectX-3 FDR InfiniBand adapter silicon.

48.    On June 26, 2012, Defendant Waldman presented at the NASDAQ OMX Investor Program restating and reemphasizing the Company's 2Q financial forecast provided on April 18, 2012. Defendant Waldman again expressly adopted and endorsed the analyst community's financial models and expectations, stating: "I think analysts have us for 2012 at $430 million as consensus, which is a very nice growth compared to 2011." In conclusion, Defendant Waldman emphasized:

> . . . *basically, we think it's a very attractive investment opportunity.* Not too many companies can say they *expect to more than double their revenues.* We say we can grow to more than $1 billion revenues, from $260 million we did last year. *So we can grow it and $430 million this year expectation. We can grow more than double our top line,* which means our bottom line is going to grow even more than that, because we have some leverage and when we expect our share price to appreciate with that. The reasons for that is, we're in a very large market. *We have the best solution out there.* The competition, which is now into the both QaLogic and Broadcom in some ways there with their Ethernet stuff. *I think they're at least a generation behind.* There is a need for our products in Web 2, in cloud, in storage, in financial services, in high performance computing, in database, and *we're seeing them adopt our products more and more. So we think we can grow with that.*

- 21 -

49.     The price of Mellanox stock would again spiral to a new all-time high on July 19, 2012, when Mellanox reported, after the close of trading on July 18, 2012, its 2Q 2012 financial results and increased 3Q 2012 sales growth forecast, which again far surpassed analyst estimates. The press release issued that day included the Company's 2Q 2012 sales of $133.5 million which came in at the high end of the Company's previous guidance range and more than doubled its revenues in the 2Q 2011. The press release also quoted Defendant Waldman emphasizing the Company's purportedly strong growth, stating, in pertinent part, as follows:

> Mellanox surpassed the $100 million quarterly revenue milestone, generating over $133 million of revenue. We benefited from growth in the HPC, Web 2.0, storage, database, cloud, Big Data and financial services markets. ***We believe this growth demonstrates the broader market acceptance of both our FDR 56Gb/s InfiniBand and 10 and 40 Gigabit Ethernet solutions***. More customers realize that 'fast interconnect' provides them with a higher return-on-investment and lower total cost of ownership.

50.     Despite knowing demand was decreasing, during the conference call that followed the issuance of the press release that day, Defendants again increased the Company's 3Q 2012 sales forecast to a range of $150 million to $155 million, far exceeding the median estimate of analysts of $104 million. Instead, during the conference call, Defendant Waldman emphasized that the 2Q 2012 results demonstrated that the Company's industry-leading InfiniBand technology was becoming the interconnect of choice for Cloud and Web 2.0 data centers, emphatically stating: "***We continue to see InfiniBand take market share in various markets as the leading interconnect for server and storage platforms***," and: "***We are seeing InfiniBand become more dominant as a storage interconnect across various markets and applications***." Defendant Gray added: "***I think it's safe to say we're seeing continued momentum in terms of adoption. . . . It's really healthy growth that we're expecting***."

51.     The investment community was again elated. This time the price of Mellanox stock soared ***more than 51%***, closing up $27.52 per share on July 19th from its July 18th close of $66.38,

again on extremely high trading volume of more than 6.3 million shares.  ThinkEquity LLC raised its price estimate for Mellanox to $120 from $81, while Wunderlich Securities Inc. increased its price estimate to $150 from $85.  Based on Defendants' bullish statements concerning the purported strong demand then being experienced for Mellanox's InfiniBand product offerings, Mizuho analyst Ruben Roy summarized the source of market's exuberance, telling *Bloomberg* that Mellanox was "a company finding itself in a very unique position *where the demand for their technology is increasing at a rapid pace and they have no competition.*"  Likewise, Wunderlich Securities Inc.'s Brian Freed told *Bloomberg* that his firm was "in general stunned at the pace of growth and the *sustained demand for their technology,*" reiterating that "*there is a great demand for their InfiniBand and we see the pace of growth continuing at a high clip.*"

52.    Defendants' Class Period materially false and misleading statements regarding the purportedly strong and consistent demand for the Company's product offerings concealed what Mellanox knew of the advanced development pace of Intel's own InfiniBand product offerings and the negative impact that would have both on Mellanox's sales growth and Intel's demand for Mellanox product offerings.  Defendants also concealed that they were receiving a deluge of customer complaints about Mellanox's own InfiniBand product offerings during the Class Period, and the adverse impact that was having on sales demand and costs.  As a result, Mellanox stock traded at artificially inflated prices during the Class Period, trading above $120 per share in intraday trading by September 6, 2012, and allowing several insiders to cash out by selling millions of dollars of Mellanox stock at fraud-inflated prices.  Defendants were also able to obtain the requisite shareholder approval of a new $5.25 million executive perk package for Waldman at Mellanox's 2012 AGM.  And, hoping to partake in a sale of Mellanox at a price reflecting the same steep premium Intel paid for Q-Logic in February 2012, Defendants touted Mellanox's purportedly stellar

- 23 -

financial results and expectations during the Class Period in order to elicit interest from potential acquirers, including participating in multiple investor conferences and roadshows.

53.    The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)    Mellanox was receiving a continuous stream of customer complaints concerning glitches in its InfiniBand product offerings during the Class Period;

(b)    Mellanox knew that the pace of Intel's development of its own competing InfiniBand adaptor would both diminish Intel's demand for Mellanox's product offering and detrimentally increase competition in the InfiniBand market that Mellanox enjoyed a near monopoly in;

(c)    Mellanox knew that its outsized 1Q and 2Q sales growth was not sustainable and was not the result of Defendants' business acumen, growth in the InfiniBand market generally, or significant adoption by the market of Mellanox's own InfiniBand product offerings, but was instead due to short-term sales boosts attributable to Intel's rollout of the Romley CPU upgrade;

(d)    Mellanox's inventory was dramatically increasing, both at the Company and in the hands of at least one significant OEM customer, which would decrease sales and profit margins going forward; and

(e)    as a result, Mellanox knew its actual sales growth supported neither its own 4Q 2012 guidance nor the inflated share price targets the investment community was modeling based on Defendants' bullish Class Period statements and guidance.

54.    Through a series of partial disclosures made between September 7, 2012 and January 3, 2013, the market learned that the Company's business was not as Defendants had portrayed it throughout the Class Period.

55.     First, on Friday September 7, 2012, Stifle Nicolaus' Kevin Cassidy downgraded Mellanox shares from "Buy" to "Hold," based on his independent research demonstrating that the market price of Mellanox stock fully reflected the Company's revenue growth and potential for further gains. The price of Mellanox stock fell 7.6% on this news, from $119.93 to $110.85, on unusually high trading volume of more than 2.9 million shares.

56.     Then, on the following Monday, September 10, 2012, Mellanox suddenly announced that Defendant Gray, who had been its CFO since 2004 and throughout is history as a publicly-traded company, was resigning. This news, right on the heels of the Stifel Nicolaus downgrade, shocked the market even more. The price of Mellanox stock was again hammered, falling 8%, from their September 7, 2012 close of $110.85 to close at $101.65 on September 10, 2012, on even more unusually high trading volume of more than 6.2 million shares trading.

57.     That same day, *Reuters* reported that Defendant Waldman had confirmed during an interview at the High-Tech Industry Association conference that Mellanox had indeed received multiple inquires concerning proposed acquisitions over the past year.

58.     Stock analyst Kerrisdale Capital also published a report on *Seeking Alpha* on September 10, 2012 concluding that sales of Mellanox's InfiniBand adapters would slow in late 2012 and sharply decline in 2013 as the boost in sales growth attributable to the Intel Romley CPU upgrade wound down, and that the Company faced growing competition. Seeking to prevent a free-fall in the Company's stock price, Mellanox responded to the Kerrisdale Capital report saying that its InfiniBand product would not face serious competition from rivals for at least three years. And by September 15, 2012, the Company's stock price had rebounded 0.7%, closing at $102.41 on September 11, 2012.

59.     But the price of Mellanox stock would again plummet on October 18, 2012 when Mellanox reported 3Q 2012 financial results and issued lower than expected 4Q 2012 fiscal 2012 financial guidance.  Though the Company reported $156.5 million in 3Q 2012 revenues, Mellanox now stated its 4Q 2012 revenue would come in between $145 and $150 million, pushing its fiscal 2012 revenue guidance down to between $524 and $529 million.  Based on Defendants' prior guidance and bullish statements, analysts had, on average, expected revenues of $156.8 million for the 4Q 2012 and $532 million in sales during fiscal 2012.  Despite Defendants' efforts on October 18, 2012 to allay investors' worse fears by adamantly maintaining that the Company continued to experience strong demand for its InfiniBand product offerings, the Company's stock price was further hammered, falling ***nearly 30%*** as this news trickled into the market, falling from its close of $104.92 on October 16, 2012 to close at $77.99 on October 18, 2012, on extremely high trading volume more than 3.2 million shares trading on October 17th and more than 6.9 million shares trading on October 18th.  Defendant Waldman told *Globes* on October 18, 2012 that the markets were "overreacting," stating Defendants remained "satisfied" with Mellanox's growth. Defendant Waldman also told *Globes* that the 3Q 2012 results "demonstrate[d] the company's continued ability to increase its penetration into existing markets, as well as to expand into new markets for our InfiniBand solutions."  During the conference call with investors, Defendant Waldman finally conceded that the Company's outsized 1Q and 2Q 2012 sales had been due to "large deals … due to the Romley pent-up demand," but now claimed that the Company's estimated $150 million in sales in the 4Q 2012 were not at all reliant upon "significant large deals," emphatically stating that the Company's Romley business would continue to grow in fiscal 2013, as people continued building large supercomputers based on Romley and future generations from Intel.

60.    The market believed Defendants' continued bullish claims that the reduced outlook did not reflect a slowdown in the adoption of its technology, and, as a result, the price of Mellanox stock remained artificially inflated. For instance, Lazard Capital Markets' Daniel Amil maintained his "Buy" rating, stating that while the guidance was disappointing, the Company's prospects remained strong, reiterating Defendants' bullish demand mantra. In its report, Lazard attributed the weak outlook to the "lumpiness of large deals," but stated it did not signal a permanent slowdown in the adoption of Mellanox's product offerings. Likewise, Deutsche Bank only cut its target price by 22% to $110 and Barclays Capital reiterated its target price of $140.

61.    However, the price of Mellanox stock fell precipitously on November 28, 2012 on market rumors that Intel was making substantial progress on developing its own InfiniBand adaptor and that Intel's product would leapfrog Mellanox's by offering 120/sec compared to Mellanox's 56Gb/sec. Despite denials by "unnamed" sources within Mellanox to the *Globes* that there was nothing new to report and that the reports concerning Intel were not true, the Company's stock price fell $16.42 per share – *or 20%* – between its November 27, 2012 close of $84.30 and its December 4, 2012 close of $67.88, again on unusually high trading volume.

62.    Finally, at 4:05 p.m. ET on January 2, 2013, Defendants were forced to concede that Mellanox had grossly missed its 4Q 2012 revenue guidance of a range of $145 to $150 million *by upwards of 20%*, reporting the Company would book sales of only $119 to $121 million in the 4Q 2012. The press release finally attributed this "shortfall," in pertinent part, to "*a weaker demand environment*" and to "*a technical issue associated with FDR 56Gb/s InfiniBand cabling which caused approximately $20 million of FDR deployments to be delayed.*" In an interview with *Bloomberg* that evening, Defendant Waldman also conceded he knew that the Company was subject to "significant competition" from Intel in the market for its 56Gb/sec InfiniBand product beginning

in 2014.  Responding to analyst critiques that Mellanox was not forthcoming enough with the investment community during the Class Period in an interview Tel Aviv-based *Globes* reported on January 4, 2012, Defendant Waldman conceded that despite having seen "that sales were not up to expectations" during the Class Period, Mellanox "didn't rush to tell" the market.  Defendant Waldman also told *Globes* that although he did not "feel good about the fact that [Mellanox had] not met [its] guidance," "***it's part of the game*. . . .**"  On this news, the price of Mellanox stock plummeted another ***18%***, closing at $50.70 per share on January 3, 2013, down $10.49 from its January 2nd close, on extremely high trading of approximately 8.3 million shares trading, or six times the average daily volume over the previous ten trading days.

63.    As a result of Defendants' materially false and misleading statements, Mellanox stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Mellanox shares were hammered by massive sales, sending them down approximately ***58%*** from their Class Period high and ***more than $2.93 billion*** in market capitalization simply vanished.

64.    Thereafter, on January 23, 2013, after the close of trading, Mellanox announced its 4Q 2012 financial results.  In addition to the lower 4Q revenues disclosed on January 2nd, the Company disclosed that in addition to "a weaker demand environment" and "a technical issue which was resolved during the quarter," the Company's 4Q 2012 revenues were harmed by "a build-up of inventory at an OEM customer."  Mellanox also issued an alarming warning on Q1 2013 results, stating on its earnings conference call later that was only on track to achieve revenue of $78 million to $83 million during the 1Q, upwards of 48% below analyst the consensus averaging $131.8 million Mellanox had led the market to expect.  The Company attributed this 1Q 2013 revenue guidance shortfall to a Q4 2012 inventory build up.  These post-Class Period disclosures confirmed the demise

in the Company's business model.  For instance, Brian Freed, an analyst at Wunderlich Securities, Inc. told *Reuters* in a reported telephone article that: "[i]t's very bad for a company to miss twice.  It will, if not permanently then for a very long time, impair the multiple Wall Street is willing to pay for the stock."

### NO SAFE HARBOR

65.    Mellanox's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

66.    The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Mellanox who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

### ADDITIONAL SCIENTER ALLEGATIONS

67.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Mellanox, their control over, and/or receipt of modification of Mellanox's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Mellanox, participated in the fraudulent scheme alleged herein.

68.    Defendants issued false and misleading statements during the Class Period to artificially inflate Mellanox's stock price to permit certain insiders to cash out their Mellanox holdings by selling millions of dollar of Mellanox stock on the open market at fraud-inflated prices. Defendants Waldman, Gray and Shulman alone sold $4.9+, $1.7+ million and $14,101, respectively, of Mellanox stock during this period.

69.    Defendant also issued the false and misleading statements during the Class Period to secure majority approval of certain shareholder proposals presented at Mellanox's 2012 AGM held in Israel on May 14, 2012. In addition to seeking a more general majority approval of the executive compensation of all Mellanox officers at the 2012 AGM, Defendants also sought and obtained shareholder approval of a perk package for Defendant Waldman worth approximately $5.25 million, including: (i) an increase in his annual base salary from $410,000 to $465,000 effective April 1, 2012; (ii) the contributions to Israeli severance, pension and education funds of up to an aggregate of 21% of his base salary from time to time and the payment of employer-matching sums for U.S. and California employee benefits paid on behalf of Defendant Waldman and related to his U.S. base salary; (iii) a cash bonus in the amount of $200,000 for services rendered for the fiscal year ended December 31, 2011; and (iv) the grant to Defendant Waldman of 84,000 restricted stock units (with an estimated market value based on the market price of Mellanox's stock that day of $4.893 million).

70.     Defendants were also touting the Company's purportedly stellar Class Period financial results in order to entice other entities to acquire the Company. To these ends, Defendants participated in multiple investor conferences and a roadshow during the Class Period and by September 12, 2012, *Reuters* would report that Defendant Waldman had confirmed in an interview at the High-Tech Industry Association Conference that Mellanox had been approached by multiple potential suitors.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

71.     At all relevant times, the market for Mellanox common stock was an efficient market for the following reasons, among others:

(a)     Mellanox stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     According to the Company's Form 10-Q filed November 2, 2012, the Company had more than 42 million shares outstanding as of October 30, 2012. During the Class Period, on average, more than one million shares of Mellanox stock were traded on a daily basis, demonstrating a very active and broad market for Mellanox stock and permitting a very strong presumption of an efficient market;

(c)     Mellanox was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d)     as a regulated issuer, Mellanox filed periodic public reports with the SEC;

(e)     Mellanox regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the

- 31 -

national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)    Mellanox was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(g)    numerous National Association of Securities Dealers' member firms were active market-makers in Mellanox stock at all times during the Class Period; and

(h)    unexpected material news about Mellanox was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

72.    As a result of the foregoing, the market for Mellanox common stock promptly digested current information regarding Mellanox from publicly available sources and reflected such information in Mellanox's stock price. Under these circumstances, all purchasers of Mellanox common stock during the Class Period suffered similar injury through their purchase of Mellanox common stock at artificially inflated prices, and a presumption of reliance applies.

**LOSS CAUSATION**

73.    During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Mellanox's business fundamentals and engaged in a scheme to deceive the market. Defendants knowingly misstated the Company's actual business metrics in order to improve the market's perception of Mellanox's worth to allow certain Mellanox insiders to cash out and to obtain shareholder approval of Defendant Waldman's $52.5 million perk package at Mellanox's 2012 AGM.

74.    By artificially inflating and manipulating Mellanox stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, as detailed herein, it

caused the price of Mellanox stock to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Mellanox stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

75.    This is a class action on behalf of those who purchased or otherwise acquired Mellanox common stock between April 19, 2012 and January 2, 2013, inclusive, excluding Defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

76.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the Defendants violated the Exchange Act; (b) whether the Defendants omitted and/or misrepresented material facts; (c) whether the Defendants knew or recklessly disregarded that their statements were false; (d) whether the Defendants artificially inflated the price of Mellanox common stock; and (e) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

77.    Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

78.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

79.     Throughout the Class Period, Defendants Mellanox and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Mellanox common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     During the Class Period, Defendants Mellanox and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Mellanox common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Mellanox common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Mellanox and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

81.     In addition to the duties of full disclosure imposed on Defendants Mellanox and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Mellanox's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful,

complete and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

82.     Defendants Mellanox and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

83.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Mellanox common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Mellanox common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Mellanox and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Mellanox stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

84.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Mellanox and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Mellanox shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

85.     By virtue of the foregoing, Defendants Mellanox and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

86.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

87.     The Individual Defendants had control over Mellanox and made the material false and misleading statements and omissions on behalf of Mellanox within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their controlling shareholder status, executive positions, board membership, and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

88.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

89.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 7, 2013

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
DAVID ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)
mfistel@holzerlaw.com
mdees@holzerlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| MLNX | 11/1/2012 | 331 | 25960.33 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| MLNX | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __6__ day of __Feb__, 2013 in ____Chicago____, ____IL____.
City                     State

(Signature) X ____Patrick Barnicle____

(Print Name) ____Patrick Barnicle____

2